**UNITED STATES of America**

v.

**Herbert William MANKE.**

**Cr. No. 23882.**

United States District Court
D. Maryland.
Jan. 16, 1958.

Leon H. A. Pierson, U. S. Atty., and William J. Evans, Asst. U. S. Atty., for United States.

Lewin Wethered, Baltimore, Md., and Hayden C. Covington, Brooklyn, N. Y., for defendant.

R. DORSEY WATKINS, District Judge.

The defendant in this criminal proceeding is charged in a one-count indict-ment with violation of Title 50 U.S.C.A. Appendix, § 462, in that he knowingly refused to submit to induction into the Armed Forces of the United States as he was required to do under the provisions of the Universal Military Training and Service Act, as amended. The case coming on for both arraignment and trial, the defendant entered a plea of "not guilty" and immediately proceeded to trial by the court. Evidence was offered by the Government and the defendant, and at the close of all the evidence the defendant moved for a judgment of acquittal, the grounds for such motion being in general (1) that the classification of 1-A given to the defendant by the appeal board constituted action that was arbitrary, capricious, and without basis in fact, and (2) that certain procedural defects resulted in a denial of due process of law. The court heard oral argument, and allowed the parties the time they requested for the filing of briefs.

### Facts.

The defendant's Selective Service System file, which is in evidence in this case, shows that the defendant registered with Selective Service on February 11, 1949 and that on November 30, 1950, he filed with Local Board No. 17 his Selective Service System Classification Questionnaire, on page seven of which defendant signed the statement that he was "By reason of religious training and belief * * * conscientiously opposed to participation in war in any form * * *" Defendant also certified that the statements made in the questionnaire were "true and complete to the best of my knowledge, information and belief." The local board did not send the defendant the special form for use by a conscientious objector. On December 4, 1950, it classified the defendant as a student.

At the time when the Classification Questionnaire was filed, defendant was a sophomore in the College of Engineering at the University of Maryland and was enrolled in the Air Force Reserve Officers' Training Corps, under the terms of which he had agreed, in writing, to accept a commission if tendered and to

serve, subject to the call of the Secretary of the Air Force, not less than two years on active duty after receipt of a commission. On May 14, 1951, having received notice of the military status of the defendant, the local board classified him as I-D, i. e. a student taking military training. On June 1, 1952 the defendant was baptized as one of Jehovah's Witnesses. On June 6, 1952 he completed his second year at the University and did not return to school the following fall.

On November 4, 1952 the defendant filed, together with a letter of explanation, the special form for a conscientious objector. The answers to the form showed that he was opposed to both combatant and noncombatant military service and believed in a Supreme Being and that such convictions, beliefs and opinions were based upon his "personal study of the Bible, assisted by publications and meetings of the Watchtower Bible and Tract Society." He stated that he believed in the use of force only for self defense. He explained as follows his participation in the AFROTC: "It was offered and required so I understood at the University. This was *before* I even considered becoming one of Jehovah's Witnesses." (Defendant's emphasis). He showed that he was baptized on June 1, 1952, and that he relied upon the official statements of the Watchtower Bible and Tract Society against participation in war and enclosed a copy of the Watch-

tower of February 1, 1951 as setting forth such official statements. This issue of "Watchtower" made it clear that Jehovah's Witnesses were opposed not only to military service but also to any participation in the defense or war effort.[1]

Accompanying the conscientious objector form was a letter explaining as follows that when he certified that he was a conscientious objector in the questionnaire of November 30, 1950, he was undecided as to where he stood in the matter of religion:

"When I filled out the original questionnaire and for some time following I was quite indecisive as to where I stood in the matter of religion, holding only a vague conception of a Supreme Being. To add to my confusion I found that together with my enrollment in the University of Maryland I was required to pursue a course entitled Basic AFROTC (Air Force Reserve Officers Training Corp [sic]). Before completing the basic course (2 years) I decided not to join the advanced ROTC and expected such written notification (according to my commanding officer) to be all that was necessary to prevent the now incorrect classification of I-D (of which I was not notified). Since June, 1952, I am convinced of my duty to Jehovah which makes my

---

1. "Why do they go so far as even to refuse to enter the Public Service camps maintained for or by pacifists and conscientious objectors, or take any part in the defense or war effort? Ask Jehovah's Witnesses why, and they will tell you it is not because they have turned pacifist. It is because they have conscientious objection to taking part in such war and defense efforts of Christendom and the rest of the world, their objection being based on God's Word, the Bible. But, you ask, how can they be conscientious objectors and not at the same time pacifists? They are not against war between the nations, and they do not interfere with the war efforts of the nations nor with anyone who can conscientiously join in such

efforts. They fight only when God commands them to do so, because then it is theocratic warfare." (The Watchtower, 2–1–51, p. 70).

"Consistent with Prophecy and Their Message

"Jehovah's Witnesses copy Jesus and obey his instructions. That is why they have not joined worldly armies and taken part in the war efforts of the nations in any way." (The Watchtower, 2–1–51, p. 71).

"It is only due to conscience that they have personally and. legally objected before draft boards to participating in the armed conflicts and defense programs of worldly nations." (The Watchtower, 2–1–51, p. 73).

participation in the affairs of nations impossible."

In describing the actions and behavior which he thought most conspicuously demonstrated the consistency and depth of his religious convictions the defendant stated the "most obvious is preaching from door to door * * * I hope that it will be possible in the very near future for me to witness as a 'Pioneer' minister. In this capacity I will be required to devote 100 hrs. per month to the preaching of God's word." The local board, based upon the conscientious objector form, classified the defendant as a conscientious objector, placing him in Class I-O.

On December 9, 1952, defendant filed a copy of an appointment as a full-time Pioneer and requested a personal appearance before the board to present his request for a classification of IV-D, i. e. a minister of religion. On March 23, 1953, the defendant had a personal appearance, requested by him, at which the local board said that "Registrant worked for Cloverland Dairy 3 days a week. Registrant was instructed that he is considered as a conscientious objector, and that Jehovah Witnesses were not considered for a IV-D classification." On April 1, 1953, the defendant appealed for a minister's classification. On April 13, after his papers were sent to the appeal board, the local board requested a report from the defendant with regard to his conscientious objections as to the kind of work that he would be willing to do. He certified that he could not perform "any *other* time consuming job" (in addition to his work as a Pioneer) since he was obligated to preach the gospel and help others to gain salvation. In describing the training, experience and proficiency he had in his ministerial work, the defendant stated: "Have been studying for years, about one year's experience, and have achieved excellent results in helping those who *want* to learn about Jehovah and his purposes."

The appeal board on April 30, 1953, classified the defendant as a conscientious objector. He was placed in Class I-O. The defendant was given an opportunity to choose one of three types of civilian work to do as a conscientious objector, which choice he refused to make, saying "I cannot conscientiously infringe upon my ministerial vocation" but instead offered to preach and thus work for the Watchtower Bible and Tract Society, the legal governing body of Jehovah's Witnesses.

On September 28, 1953, following a hearing as to the type of work that the defendant would perform as a conscientious objector, the local board reclassified him in Class I-O. Minutes of this hearing show:

"Registrant stated that it was impossible for him to relinquish his time for the sake of an [sic] civilian job which was so much less beneficial and important because he had make [sic] a dedication of himself to God to do more important work in the ministry."

On October 5, 1953, he was again given an opportunity to choose three types of work. He again refused, consistently basing his objection to doing civilian work contributing to the national interest on the time consuming nature of such civilian work. Within ten days from the classification he appealed to the appeal board, again seeking a minister's classification. Following the appeal he sent a letter showing that he devoted a total of 47 hours to his ministry weekly, of which 15 hours a week were spent in door to door preaching. In this letter he showed that he had been dropped as a Pioneer because he could not devote the minimum of 100 hours a month to "door to door preaching" and stated:

"I have made a dedication of myself to serve God. This solemn agreement into which I have entered does not require only spasmodic, irregular or part-time activity. Rather, it is an agreement, unreservedly and unconditionally, to do the will of Jehovah God through Jesus Christ accordingly as that will is made plain from the Bible. Since this dedication constitutes an obligation

to God, no one or nothing can relieve me of this obligation; and the work offered to me by the board would constitute a breaking of my vows making me deserving of death.

\*     \*     \*     \*     \*

"In keeping with my decision I have relinquished my goal as a chemical engineer (since it would mean full-time work) for the sake of something more vital—the ministry. After giving up this and other things in an effort to please God and serve His purposes toward mankind's blessings it would be wrong and senseless for me to serve another master. I am therefore working toward an efficient exercise of my vocation as a minister.

"This *dedication is a prime reason for not offering to do civil work* and of my insisting upon a classification of IV-D." (Emphasis supplied).

In accordance with the usual procedure when a registrant refuses to perform the proffered alternative service, the defendant's file was forwarded to the National Headquarters on October 15, 1953, to secure authority to order the defendant to perform civilian work in lieu of induction. By letter dated December 8, 1953, the local board was advised that it was impossible to secure the requested order to report for civilian work due to the fact that the local board had erred in saying that no Jehovah's Witness was eligible for a ministerial classification and also because the local board had apparently overlooked the defendant's letter of appeal dated October 8, 1953. The local board was advised to permit defendant to submit additional proof regarding his ministerial status and, if on the basis of such proof a IV-D classification was not thought proper, to consider defendant's letter of October 8, 1953 as sufficient notice of appeal.

The local board on January 25, 1954, classified the defendant again as a conscientious objector. In response to his request for personal appearance the local board scheduled a hearing at which time defendant answered the twelve questions propounded to registrants who are Jehovah's Witnesses and claim ministerial classifications. The answers to the questionnaire indicated that the defendant's secular employment consisted of driving a milk truck three days a week, eight hours a day, while his ministerial duties included conducting school two hours a day, praying one and one-half hours a day and distributing literature from door to door. To the latter activity of distributing literature the defendant devoted sixty-five hours a month. To the question "Is registrant's conscientious objection based primarily upon his desire to preach or upon his unwillingness to use force?" the defendant answered: "Desire to preach."

On April 13, 1954, defendant filed a lengthy letter with the local board showing his reasons for claiming classification as a minister. He said, among other things:

"To begin with I have not always associated myself with Jehovah's Witnesses or the Watchtower Bible and Tract Society but since June 1, 1952 I have been convinced as to what the proper position for me to take should be. In an effort to do justice to my present chosen vocation, the ministry of the gospel, I felt it necessary to leave the studies of chemical engineering at the University of Maryland. Having put forth much effort to be able to pursue and to afford a college education, I would not have relinquished that goal had I not been both sincere and completely convinced that the ministry of the gospel is a necessity for all Christians to exercise. Furthermore, for four years my parents and younger brothers had been embracing the witness work before I made my decision and therefore it was not a decision made in haste or without considerable thought.

\*     \*     \*     \*     \*

"Brief definition of the above terms follow. The house to house

work is a preaching work carried to the homes of the public. Short sermons at the doors are designed to interest the people in a study of God's word which means life to those meek enough to listen.—John 17:3. An effort is made to leave literature in further explanation of various truths with the intention of a return visit to encourage and to aid further study.

\* \* \* \* \*

"The ministry is my *primary vocation and virtually all my time and efforts are put forth to promote the ministry.* It is a privilege to serve many people in the house to house work, studies, etc. and these make up a congregation even larger than that to which an average clergyman speaks in the course of a week. (Emphasis supplied).

\* \* \* \* \*

"The public ministry together with the public meeting program besides serving more people also serves many who otherwise are not reached by sermons or literature with which they might prove to themselves 'the good and acceptable and complete will of God.' As brought out before, literature is placed with the intention of making return calls but at the same time literature provides a substitute for the oral sermon and is a means of introducing the message of God's Kingdom to the people. Acts 17:11 commends those who carefully examine the scriptures to see if these things are true and possession of literature enables them to do so. At times I have been able to serve those who have read literature while beforehand they would not discuss these things orally. \* \* \* "

"Like many others I work at a secular job part-time but I work at the ministry full-time \* \* \* "

On April 20, 1954, defendant complained to the local board as follows:

"I feel that an injustice may be done by placing much stock in the answers to the twelve question form that were given orally at the hearing. For example, involving two questions, I believe that the record of time spent in house to house preaching was removed from one question and applied to another concerning 'selling and distribution of literature' whereas the use of literature is but incidental to the preaching work. For any useful information I should be allowed to write my own answers to such questions. It is also an injustice that hearings and letters to the local board are serving no immediate purpose because the board has by its own words washed their hands of cases concerning Jehovah's Witnesses leaving any decisions to higher authorities."

The defendant was married on October 23, 1954. On November 23, 1954 the local board reviewed defendant's classification of I-O and decided to let the conscientious objector classification stand.

During December of 1954 the local board again considered the claim of the defendant to classification as a minister. A letter was written to the Watchtower Society. Since the defendant had been dropped as a Pioneer on August 1, 1953, the Society was not able to advise the board of the number of hours devoted by the registrant to the ministry. On inquiry to the North Unit of the Baltimore Congregation of Jehovah's Witnesses the local board was informed by one Robert W. Manke that the defendant since August 1, 1953 had "spent an average of 30 hours each month outside the congregation, helping interested persons in their homes to understand the purposes of Almighty God," no record being kept of the time spent in private study, attending meetings, and preparation for courses and meetings. The local board on February 21, 1955 classified the defendant as a conscientious objector, placing him in class I-O.

**770**

In April 1955 the defendant submitted an approximate weekly schedule concerning his "preaching activities":

| | |
|---|---|
| "Door to door preaching | 10 hours |
| Home bible studies and prep. | 7 |
| Meeting attendance | |
|     Sunday | 4 |
|     Tuesday | 1½ |
|     Friday | 3½ |
| Preparation | |
|     Congregation book study | 1 |
|     Ministry school | 3 |
|     Assigned parts | 2 |
| Personal study | 3 |
| Travel | 4 |
| Miscellaneous | 2 |
| | 41 hours" |

The defendant was notified to appear before the local board on August 8, 1955, for a hearing. Following this hearing the local board again classified the defendant in class I-O, making him liable to perform civilian work as a conscientious objector. On August 20, 1955, the defendant appealed and his file was forwarded to the appeal board, which referred the case to the Department of Justice for inquiry, hearing and recommendation. (See Bates v. United States, 1955, 348 U.S. 966, 75 S.Ct. 529, 99 L.Ed. 753; De Moss v. United States, 1955, 349 U.S. 918, 75 S.Ct. 659, 99 L.Ed. 1251).

On August 16, 1956, the Department of Justice made its recommendation to the appeal board to the effect "that the appeal of the registrant be not sustained", such recommendation being based on the conclusion that the defendant was not conscientiously opposed to participation in either combatant or noncombatant military training and service. Attached to the recommendation was a résumé of the F.B.I. report on its investigation of the defendant. The next day a copy of the Department of Justice's recommendation and a copy of the résumé of the F.B.I. report were forwarded to the defendant by the appeal board, along with a letter advising him that he might file a written reply within thirty days, which reply "and all other data in your file will be considered by this Board when it acts upon your appeal." On September 16, 1956 the defendant wrote to the appeal board challenging certain statements in the recommendation and the résumé. On November 1, 1956 the appeal board classified the defendant I-A. Thereafter the defendant was ordered to report for induction, did report and refused to submit to induction. The present indictment followed. During the trial, counsel for defendant withdrew any contention that at the time of the appeal board decision in question, defendant was entitled to a ministerial classification.

"In a prosecution for refusing to submit to induction, the scope of judicial inquiry into the administrative proceedings leading to the defendant's classification is very limited. *The range of review is the narrowest known to the law.* Campbell v. United States, 4 Cir., 221 F.2d 454. The 'clearly erroneous' rule applied in equity appeals has no place here, nor even the 'substantial evidence' rule of the Administrative Procedure Act, 5 U.S.C.A. § 1009. Congress gave the courts no general authority of revision over draft board proceedings, and we have authority to reverse only if there is a denial of basic procedural fairness or if the conclusion of the board is without *any* basis in fact. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428; Goff v. U. S., 4 Cir., 135 F.2d 610." (Emphasis supplied). (Blalock v. United States, 4 Cir., 1957, 247 F.2d 615, 619).

A fundamental question for consideration then is whether or not the classification of I-A had any basis in fact (Estep v. United States, 1946, 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567; Witmer v. United States, 1955, supra, 348 U.S. at page 381, 75 S.Ct. 395). The issue before the appeal board was the defendant's sincerity "in objecting, on religious grounds, to participation in war in any form. In these cases, objective facts are relevant only insofar as they

help in determining the sincerity of the registrant in his claimed belief, purely a subjective question. In conscientious objector cases, therefore, any fact which casts doubt on the veracity of the registrant is relevant. It is 'affirmative evidence * * * that a registrant has not painted a complete or accurate picture * * *.' Dickinson v. United States, supra, 346 U.S. 389, at page 396, 74 S.Ct. 152 [98 L.Ed. 132]." (Witmer v. United States, 348 U.S. 375, 381–382, 75 S.Ct. 392, 396).

The defendant's membership in the Air Force Reserve Officers' Training Corps and his agreement to accept a commission and to serve not less than two years on active duty is difficult to reconcile with his simultaneous certification that "by reason of religious training and belief" he was "conscientiously opposed to participation in war in any form". The defendant's explanation to the local board and later to the hearing officer that the military training course was "required", scarcely establishes the depth of religious conviction necessary. "At best it conveys the thought that he was under the impression that to attend" the University "it was compulsory to join the military service and for that reason he did so. His motivation points strongly to a lack of the sincere religious belief opposing war which must be present to sustain the type of claim at bar where the evidence is that registrant's religious group gave its members freedom of choice on the question of conscientious objection to military service." (United States v. Borisuk, 3 Cir., 1953, 206 F.2d 338, 343). The defendant's claim to status as a conscientious objector "by reason of religious training and belief" [2] is not consistent with his further and subsequent explanation that he participated in AFROTC because when "I filled out the original questionnaire [November 30, 1950] and for some time following I was quite indecisive as to where I stood in the matter of religion, *holding only a*

*vague conception of a Supreme Being.*" (Emphasis supplied).

Even in view of the permissible inferences which might be drawn from the above conflicting statements and conduct, the local board six times and the appeal board once classified the defendant as a conscientious objector, placing him in class I-O. Thus it becomes highly pertinent to consider what facts, in addition to the defendant's participation in AFROTC and his explanations relating thereto, the F.B.I. résumé and the recommendation of the Department of Justice disclosed.

Admittedly, there are statements contained in the résumé and recommendation favorable to the defendant, but, since this court's function is merely to find whether or not there is any basis in fact for the conclusion reached by the board, only the evidence supporting its classification will be reviewed here, with the added qualification that only those facts appearing in the F.B.I. résumé and the recommendation of the Department of Justice which are unchallenged, undenied or conceded by the defendant will be relied upon by this court to support the classification of I-A.

Over the almost four year period in which the defendant was challenging the conscientious objector classification given him and claiming in its stead a ministerial classification, his insistence upon one fact stood out above all others. He was obligated to preach the gospel. Hence, as a student, he sacrificed his goal of a college education and thereafter took part-time employment to enable him to devote himself ("full-time"!) to his primary vocation of the ministry. His refusal to participate in war in any form was by his own admission based primarily upon his desire to preach as distinguished from his unwillingness to use force. He was consistent in declining to engage "in the affairs of nations", even refusing to perform work contributing to the maintenance of the national health,

2. Defendant's only serious or consistent "religious training and belief" prior to 1950 had been in the Lutheran faith.

There was no contention that "opposition to participation in war in any form" was a tenet of that faith.

safety or interest because "Since I already have the obligation upon me to preach the Gospel and help others to gain salvation, I *cannot* 'offer' to perform any *other* time consuming job." [3]

A materially different picture of the defendant is revealed by the recommendation and the résumé than that drawn by the defendant himself, as outlined above. Although the defendant has attacked the résumé and recommendation on other grounds, as previously stated, the following facts are acknowledged by the defendant to be true. While the defendant maintained a high scholastic average in junior and senior high school, he is remembered as, and his record shows that he was, a poor student during the two years of his university career, a fact which might well reflect upon the absolute truthfulness of the defendant's reiterated statement that he sacrificed his goal of being a chemical engineer to devote himself to the ministry. The record indicates that since June 1955 the defendant had been engaged in full time secular employment earning approximately $360 a month, while conversely the average hours per month dedicated to his religious activities, including but not restricted to his "kingdom preaching" as shown in the records of the Assistant Congregation Servant of the Parkville Unit of Jehovah's Witnesses, had declined sharply from a high of 42 1/5 hours a month in August through December 1953, to a low of 16 3/10 hours a month in January through October 1955.

While the point is not how many hours one is required to devote to ministerial duties to qualify as a bona fide conscientious objector, there is definitely in issue the defendant's sincerity in claiming conscientious objection to participation in war. The defendant's continued assertion over a period of almost four years of a claim to a ministerial classification in the face of his engaging in ever increasing secular employment and ever decreasing ministerial duties is not without relevance to his sincerity in pressing his present claim of conscientious objection. As the Supreme Court said in Witmer v. United States, 1955, 348 U.S. 375, 383, 75 S.Ct. 392, 396:

"It would not be mere suspicion or speculation for the Board to conclude, after denying Witmer's now-abandoned claims of farmer and minister, that he was insincere in his claim of conscientious objection. Even firemen become dubious after two false alarms. Aside from an outright admission of deception—to expect which is pure naivety—there could be no more competent evidence against Witmer's claimed classification than the inference drawn from his own testimony and conduct. There are other indications which,

3. In Sicurella v. United States, 1955, 348 U.S. 385, 391, 75 S.Ct. 403, 99 L.Ed. 436, as the issue of whether or not one may claim exemption as a conscientious objector based not on "a feeling that it is wrong to participate in war but because such participation will require time which petitioner feels should be devoted to his religious activities" was not properly raised, the Supreme Court found it unnecessary to consider that point. Likewise, because of the view which this court takes of the instant case, this issue is not reached. However, should the point be of any significance to a reviewing court, this court finds that not merely was there evidence which would have justified the board in finding that defendant's only concern was the avoidance of interference with his choice of work, rather than the nature of the interference, but that the evidence would justify

such conclusion beyond a reasonable doubt. Defendant's entire attitude was that he had selected his life work; and the sole determination of what such work required, and what would improperly interfere with it, rested in his uncontrollable judgment and discretion. Thus his acceptance of work in state hospitals offered by the local board "would constitute a breaking of" his vows making him "deserving of death" but the acceptance, by *his* choice, of work in a dairy three days a week before, and four days a week after, marriage, and current full-time employment in a steel mill, is considered by him, sitting as legislature, judge and jury, to be entirely consistent with his dedication to full-time work in the ministry. In fact, that which he calls his ministerial activity has suffered a steady and violent attrition.

while possibly insignificant standing alone, in this context help support the finding of insincerity."

The other indicia of insincerity may be briefly summarized. First, the defendant's records of hours given over to religious activities as submitted to the local board are completely irreconcilable with the official records of the Watchtower Bible and Tract Society. The weekly schedule submitted by the defendant in October 1953 showing 47 hours a week devoted to religious duties including 15 hours a week spent in door to door preaching, and the weekly schedule submitted by the defendant in April 1955 showing a total of 41 hours a week including 10 hours a week in door to door preaching, as well as the defendant's letter of April 1954 claiming 65 hours a month given to door to door preaching are flatly contradicted by the records of the Watchtower Bible and Tract Society evidencing a *total* of 53 3/8 hours spent in "Kingdom preaching" in the six months period from December 1952 to July 1953 and an average *monthly total* devoted to *all religious work* of 20 8/9 hours—March through November 1952; 42 1/2—August through December 1953; 22 1/3—January through December 1954; 16 3/10—January through October 1955. Thus the defendant in claiming a ministerial classification represented to his board that he was devoting more than twice as much time a week to his religious activities as in reality he was devoting to such work in a month.

Secondly, the type of secular employment sought by the defendant is not without significance. The F.B.I. résumé shows that in June 1955 the defendant went to work as an instrument mechanic's helper full-time in the fuel department of the Bethlehem Steel Company, a defense plant closely connected with the production of war materials. "While each case must of necessity be based on the particular beliefs of the individual registrant, it is true that the Congress, by relating the registrant's conscientious objection to his religious training and belief, has made the belief of his sect relevant." (Sicurella v. United States, 348 U.S. 385, 390, 75 S.Ct. 403, 405). The defendant by forwarding to his draft board a copy of the February 1, 1951 issue of "The Watchtower" has demonstrated not only what the beliefs of his sect are but also that he is aware of, and relies upon, such beliefs to guide him in the conduct of his personal life. Indeed, the defendant, as early as November 1952, told the local board "my participation in the affairs of nations [is] impossible." When the obvious inconsistency between the defendant's verbalizations and his actual conduct was pointed out to him by the hearing officer, his explanation was that "it never occurred" to him that his employment could be construed as being engaged in defense work.

In reviewing the objective facts involved in this case, this court cannot say that upon the record before the board there was no factual basis for the board's conclusion that the defendant was not sincerely, conscientiously, opposed to participation in either combatant or noncombatant military training and service. Were the scope of review of this court such as to require the finding of substantial evidence, or even the preponderance of evidence, to support the classification of I-A, the court would have no difficulty in making such a finding. Other than the fact that the defendant since June 1, 1952, has been a member of a sect which adopts conscientious objection as one of its tenets, there is no objective evidence sustaining the defendant's claim. Beginning in 1949 the defendant took religious books to work with him and engaged in religious arguments with fellow workers. This is not the equivalent of, nor proof of, *"prior expression of his allegedly deeply felt religious convictions against participation in war."* (Emphasis supplied.) (Witmer v. United States, 348 U.S. 375, 383,[4] 75 S.Ct. 392, 396).

4. The F.B.I. résumé indicates the necessity for distinguishing between religious convictions and conscientious objection when it states "A fellow worker advised

■ In summary, from the original claim of being a conscientious objector at a time when defendant was serving in the Air Force Reserve Officers Training Corps; his later and continuous claim of ministerial exemption in the face of rapidly declining ministerial activity; his acceptance of secular work, and the responsibilities of a family; and his ultimate full-time employment in a steel mill, there existed evidence from which the appeal board might well reach the conclusion that defendant's objection to war in any form was not a conscientious one.

■ The attack of the defendant relative to procedural errors is twofold, going first to the adequacy of the résumé of the F.B.I. report, and secondly to the accuracy of some of the statements in the recommendation of the Department of Justice. The résumé is challenged on the basis that the Department of Justice failed therein to make a full and fair summary of the *favorable evidence* appearing in the F.B.I. report. This charge is made without a single fact, or scintilla of evidence, to support it; its nebulous quality being emphasized by the argument of defendant's counsel:

"It is true that in the final recommendation of the Department of Justice to the appeal board it is implied that the evidence gathered by the FBI report appears in the resume. But nowhere in the resume or the recommendation does it appear that the resume contains a summary of all the favorable evidence turned up by the FBI investigation. The Court must speculate to say that the resume does contain all of the favorable evidence. The Supreme Court has prohibited any speculation . in determining whether the draft boards and the Department of Justice have complied with the procedural due process requirements.— Simmons v. United States, 1955, 348

U.S. 397, 404–406 [75 S.Ct. 397, 99 L.Ed. 453]; Gonzales v. United States, 1955, 348 U.S. 407, 414–417, [75 S.Ct. 409, 99 L.Ed. 467]; compare Steele v. United States, 1 Cir., 1956, 240 F.2d 142.

"It is manifest that the Department of Justice may have withheld vital and material evidence handed to the FBI, favorable to defendant, that should have been forwarded by it to the appeal board but that was not submitted to the appeal board by the Department of Justice in the resume." (Defendant's brief, p. 26).

This court is not prepared to presume, in the absence of any evidence whatsoever, that those agencies and persons entrusted with the proper administration of the Universal Military Training and Service Act have acted in such a way as to deny the defendant a full and fair hearing or as to deny him a full and fair opportunity to present his side of the case to the appeal board contrary to section 6(j) of the Act, 50 U.S.C.A.Appendix, § 456(j) and the regulations promulgated thereunder.

What the defendant is attempting to do is obvious. He is seeking to obtain access to the F.B.I. files themselves, for in no other way under the circumstances as they exist in this case could it be determined whether or not the allegedly "favorable evidence" was fairly and adequately summarized for the appeal board. Should the defendant's position be upheld, "[The] inevitable result would be to entitle the registrant to the report in all cases." (Blalock v. United States, 4 Cir., 1957, 247 F.2d 615, 620.) The Fourth Circuit has had occasion recently in the Blalock case and in Meredith v. United States, 4 Cir., 1957, 247 F.2d 622, to consider the exact issue raised herein by the defendant. The conclusion reached by the Fourth Circuit is that notwithstanding the Su-

that he had had religious discussions with the registrant but that the registrant had never told him of his conscientious ob-

jector views and that he would consider the registrant to be sincere in his religious convictions."

preme Court opinion in Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, the production of F.B.I. files in cases of conscientious objectors remains governed by the law as propounded in United States v. Nugent, 1953, 346 U.S. 1, at pages 5–7, 8, 9, 10, 73 S.Ct. 991, 994, 97 L.Ed. 1417, in which the Supreme Court said:

"We think that the statutory scheme for review, within the selective service system, of exemptions claimed by conscientious objectors entitled them to no guarantee that the FBI reports must be produced for their inspection.[5] We think the Department of Justice satisfies its duties under section 6(j) when it accords a fair opportunity to the registrant to speak his piece before an impartial hearing officer; when it permits *him to produce all relevant evidence in his own behalf* and at the same time supplies him with a *fair résumé of any adverse evidence* in the investigator's report.

"Respondents urge that this is not enough. The argument rides hard upon the word 'hearing' in § 6(j). It is suggested that the 'hearing' prescribed by Congress was purposely designed to allow the registrant to refute—item by item, if necessary—the matters discussed in the investigator's report. In sum, respondents assimilate the 'hearing' in § 6(j) to a trial and insist that it imports *a right to confront every informant who may have rendered adverse comment to the FBI.*

\* \* \* \* \* \*

" \* \* \* Congress was under no compulsion to supply this auxiliary service—to provide for a more exhaustive processing of the conscientious objector's appeal.

\* \* \* \* \* \*

"Respondents urge that they have a right to such a procedure under the Fifth Amendment. We cannot agree.

\* \* \* \* \* \*

" \* \* \* Under the circumstances presented, we cannot hold that the statute, as we construe it, violates the Constitution." (Emphasis supplied).

As Judge Sobeloff, speaking for the Fourth Circuit, said in the Blalock case:

"The defendant claims, however, that the nature of the evidence and the purpose for which he wishes to examine it are not the same here as in the Nugent case, and thus attempts to distinguish the two cases. He maintains that in Nugent, the registrant desired the F.B.I. report only to rebut the adverse evidence contained therein, whereas here the object is to determine whether the favorable evidence was fairly and adequately summarized for the appeal board. In our opinion, a distinction on this basis would be untenable." (Blalock v. United States, 1957, 247 F.2d 615, 619–620).

The distinction which the defendant attempts to make would not only open the F.B.I. files in all cases but, in effect, would take "the burden of clearly establishing a right to the exemption" (Dickinson v. United States, 1953, 346 U.S. 389, 395, 74 S.Ct. 152, 157, 98 L.Ed. 132) away from the registrant, and place upon the government the burden of trying to prove the registrant's case for him lest the proceedings be attacked, not on the ground that the résumé did not fairly and accurately summarize the favorable evidence appearing in the F.B.I. report, but rather on the ground of denial of due process in the failure of the F.B.I. to uncover evidence favorable to the

5. Should, however, a reviewing court hereafter feel that concepts of basic fairness require the production of the original F.B.I. reports and a comparison of their contents with the résumé, the reports have been placed, unexamined, in a sealed envelope; marked as defendant's exhibit No. 2 for identification; and given into the custody of the Clerk of the court to remain unopened subject to the further order of the court.

registrant. Surely the presentation of favorable evidence for the record is a part of the defendant's prima facie case.

The rule is well established that the defendant is entitled to be supplied with a fair résumé of the adverse evidence in the F.B.I. reports (United States v. Nugent, 1953, 346 U.S. 1, 6, 73 S.Ct. 991, 97 L.Ed. 1417; Simmons v. United States, 1955, 348 U.S. 397, 398, 75 S.Ct. 397, 99 L.Ed. 453; Gonzales v. United States, 1955, 348 U.S. 407, 412, 75 S.Ct. 409, 99 L.Ed. 467), a fair résumé being defined as "one which will permit the registrant to defend against the adverse evidence—to explain, rebut it, or otherwise detract from its damaging force" (Simmons v. United States, 1955, 348 U.S. 397, 405, 75 S.Ct. 401,). This the defendant in the instant case does not deny he has received. In the absence of any showing of arbitrary, deliberate, or prejudicial withholding by the Department of Justice from the appeal board and from the defendant of information favorable to the defendant, this court cannot find upon the record in this case any denial of basic procedural fairness arising out of the résumé submitted to the appeal board and to the defendant.

The final contention of the defendant is that the recommendation of the Department of Justice contained certain misrepresentations, namely, (1) that the defendant was "brought up" in the faith of the Jehovah's Witnesses, (2) that the history of his participation in AFROTC presented "a compromising factor that must be considered," (3) that the defendant's explanation that this course in military training was compulsory was "a compromise of his religious beliefs" and showed "his religious convictions did not have great depth", (4) that during the time the defendant was "pioneering" for the Jehovah's Witnesses he contributed only an average of 53⅔ hours from December 1952 through July 1953 whereas a "Pioneer Minister" of Jehovah's Witnesses is required to devote at least 100 hours a month to his Kingdom preaching, and (5) that the résumé showed that opinion was divided as to the sincerity of registrant's conscientious objection.

The exceptions taken by the defendant to statements (2), (3) and (4) may be disposed of promptly. Mere willingness to increase agricultural production and thus "contribute a satisfactory amount for the war effort and civilian use" has been held to be a pertinent factor, and a compromising one, if inconsistent with other statements and conduct of the registrant claiming to be conscientiously opposed to participation in war in any form. (Witmer v. United States, 348 U.S. 375, 378, 382–383, 75 S.Ct. 392, 99 L.Ed. 428). Likewise, willingness to engage in defense work, actual employment in a defense plant, and enlistment in the National Guard have been held to be conduct reflecting on the sincerity of the defendant. Thus to require a satisfactory explanation by the defendant of the apparent inconsistency between practice and profession is entirely reasonable. (Blalock v. United States, 247 F.2d 615; Meredith v. United States, 247 F.2d 622; Jones v. United States, 4 Cir., 1957, 241 F.2d 704; Goff v. United States, 4 Cir., 1943, 135 F.2d 610). Two years participation in AFROTC, having agreed in writing to accept a commission if tendered and to serve on active duty, at a time during which defendant was claiming to be conscientiously opposed to participation in war in any form is certainly, in the words of the recommendation of the Department of Justice, "a compromising factor that must be considered." Evidently the defendant himself thought so as his Selective Service file contains many references by him to this matter, and attempted explanations thereof, some of which have been previously quoted in this opinion. In specifically answering the statement of the Department of Justice, the defendant wrote to the appeal board as follows:

"My parents became Jehovah's Witnesses about the year 1948 and despite their good example I was not convinced that Jehovah's Wit-

nesses had the true religion until 1952 whereupon I made public declaration of my dedication to Jehovah by being baptized June 1, 1952. Having made my decision at this time I aquired [sic] the Special Form for Conscientious Objectors from Local Board 17 and filed my claim 11/3/52. Therefore my participation in ROTC does not present a compromising factor but serves only to mark the time of my being convinced of the truth. Paragraph 5 of the Department of Justice recommendation construes this to indicate a compromise of religious beleif [sic] and also that my religious convictions are of no great depth. This is wholly unfair and unjust."

His primary contention there, as here, is that the depth, nature and sincerity of his beliefs are to be accepted as defined by him at the time of his final classification. He does not claim originally to have held such beliefs. Defendant's counsel argues that defendant's case involves "a gradual growth from (1) no conscientious objection to (2) conscientious objection to being a noncombatant [sic] soldier to (3) a full-fledged conscientious objector opposed to both combatant and noncombatant military service." Therefore all antecedent facts, including the veracity of defendant, are relevant on the question of the sincerity of the beliefs professed by him at the time of final classification.

During the trial of the case the defendant took the stand, his oral testimony being received for the purpose of, and being limited to, an effort to prove a denial of procedural due process of law. The court cannot consider and has not considered this testimony in determining whether or not there is any basis in fact for the classification given (Cox v. United States, 1947, 332 U.S. 442, 453–455, 68 S.Ct. 115, 92 L.Ed. 59; Pine v. United States, 4 Cir., 1954, 212 F.2d 93, 97). The testimony had been considered in determining whether or not

the statements made by the Department of Justice, and challenged by the defendant, are misrepresentations. It reaffirmed the execution of the form on November 22, 1950, stating that defendant was conscientiously opposed to "participating in war in any form"; that in entering ROTC he knew that "the Bible said not to kill, and that God would not approve of war effort" and that he "participated in the basic course of the ROTC knowing that I would not have to continue if I did not wish to"; that he was not then one of Jehovah's Witnesses, but his stand was an accumulation of information from his mother, some other Jehovah's Witnesses, the Bible, and seeing what war has done to the world. It was hard to say that he did not believe in God; "It is such a fine line." He further testified that he was not able to make the one hundred hours a month for door-to-door ministerial work required of Pioneers, because *It just seemed like there was a number of other things taking up my time.* (Emphasis supplied). This inability for "full-time pioneer work" became apparent "After possibly six months". He worked at Bethlehem Steel during the time his classification was being considered by the appeal board, involving "maintenance on the recorders of the open hearth furnaces used in the production of steel." He knew this steel was used "for defense line ships" but he thought "it is consistent for a conscientious objector to work in a steel plant". During the time he was appointed a Pioneer minister, he never achieved the requirement of 100 hours a month. "Within six months before June 1" 1952 he had made up his mind that "what Jehovah's Witnesses were doing was correct."

Can it fairly be said that the history of the defendant's participation in AF ROTC from September 1950 to June 6, 1952, is not a compromising factor to be considered when the defendant himself felt called upon again and again to attempt to explain this matter? Compare the explanation that he took the required

military training *before* I even considered becoming one of Jehovah's Witnesses" with his sworn testimony that within six months before June 1, 1952 he had decided to adopt the tenets of Jehovah's Witnesses and to become a member of that sect, and that in 1950 he was a conscientious objector "opposed to war at that time". How can the defendant now object to the statement of the Department of Justice that his explanation of his participation in AFRO TC constituted a compromise of his religious beliefs and showed lack of depth of conviction in the face of the defendant's own statements that during that time he was "indecisive", "holding only a vague conception of a Supreme Being", finding it "hard to say that you don't believe in God" and being confused by the requirement that he take basic AFROTC? Rather than a misrepresentation the court finds the statements of the Department of Justice an accurate and fair summary of the defendant's own evaluation of the situation in which he found himself.

The statement that during the time that the defendant was pioneering he never fulfilled the requirements of the Watchtower Bible and Tract Society necessary to qualify as a pioneer minister was completely accurate and was relevant not only to the objective issue of whether or not the defendant was in fact entitled to the ministerial classification that he was seeking on appeal to obtain, but also was relevant to the subjective issue of the defendant's sincerity in claiming conscientious objection to the extent that lack of sincerity and good faith of the defendant in continuing through 1956 to seek a ministerial deferment after having been dropped from the rolls of Jehovah's Witnesses as a pioneer minister on August 1, 1953, might have bearing on the question of his truthfulness and honesty in asserting his opposition to war in any form.

The two remaining statements contained in the recommendation and objected to by the defendant, that the defendant was "brought up" in the faith of Jehovah's Witnesses and that the F.B.I. résumé disclosed opinion was divided as to the sincerity of the defendant's conscientious objection, involve somewhat different considerations. It might well be argued that the words "brought up" in the faith are properly applicable under the facts in this case wherein the defendant formally embraced the faith shortly after reaching his majority, his parents and brothers having been urging such a decision on his part from the time he was 17 years old. Assuming, arguendo, the words used were inapplicable, the question then becomes, does their use coupled with the statement regarding divided opinion as to the defendant's sincerity constitute such a denial of procedural due process as to invalidate the proceedings before the appeal board and thus require a judgment of acquittal by this court. The answer to this question, if favorable to the defendant, will terminate his obligation to perform any type of service under the Universal Military Training and Service Act, as amended, he now being over the age limit and, therefore, not subject to the provisions of the Act.

The defendant relies heavily upon Sicurella v. United States, 1955, 348 U. S. 385, 75 S.Ct. 403, 99 L.Ed. 436, in which the Supreme Court held that an error of law appearing in the recommendation of the Department of Justice "to which the Appeal Board might naturally look for guidance on such questions, must vitiate the entire proceedings at least where it is not clear that the Board relied on some legitimate ground. Here, where it is impossible to determine on exactly which grounds the Appeal Board decided, the integrity of the Selective Service System demands, at least, that the Government not recommend illegal grounds." (Sicurella v. United States, 348 U.S. 385, at page 392, 75 S.Ct. at page 406). The case is inapposite. There it was admitted that the registrant was sincere in his beliefs, the only question being one of law, and the Department of Justice's statement

of the law being erroneous. Here the defendant seeks to come within the holding of the Sicurella case by combing the recommendation of the Department of Justice, a recommendation replete with uncontradicted factual evidence sustaining the conclusion that the defendant was not sincere in his conscientious objection, and by abstracting from the recommendation two sentences allegedly containing errors of fact to vitiate the entire proceedings against him. The whole procedure as outlined by section 6(j) of the Universal Military Training and Service Act, as amended, and as interpreted by the Supreme Court contemplates error on the part of the Department of Justice either in its statement of facts or in its conclusions drawn therefrom. The basis for the procedural safeguards carved out by the Supreme Court in construing the congressional mandate contained in section 6(j) of the Act as requiring that the registrant be furnished with a fair résumé of the F.B.I. report and that, in addition, he be furnished with a copy of the recommendation of the Department of Justice is to enable the defendant to contradict "the basis of the Department's conclusion", to diminish "the forcefulness of its thrust", to allow him to "muster his facts and arguments to meet its contentions", and to give him the "right to file a meaningful statement, one based on all the facts in the file and made with awareness of the recommendations and arguments to be countered" (Gonzales v. United States, 1955, 348 U.S. 407, 413–415, 75 S.Ct. 409, 413).

The defendant had the benefit of these procedural safeguards and he made the most of them. On March 14, 1956 he was notified of the hearing before the hearing officer scheduled for April 24, 1956 and was furnished with a copy of the résumé of the F.B.I. investigation. The hearing officer's report states, in part:

"The registrant's parents are living, and members of the Jehovah's Witnesses faith. In addition, he has two brothers, both of whom are working as Jehovah's Witnesses Pioneers. The entire family were formerly members of the Lutheran Church.

"The registrant states that he became interested in the work of Jehovah's Witnesses during the summer of 1951, while he was a student at the University of Maryland, and after about a year of study in the work of Jehovah's Witnesses, was baptized in that faith on June 1, 1952."

Thus the defendant was allowed his first chance "to defend against the adverse evidence—to explain it, rebut it, or otherwise detract from its damaging force" (Simmons v. United States, 1955, 348 U.S. 397, 405, 75 S.Ct. 397, 99 L.Ed. 453). The defendant's explanation appears in the recommendation of the Department of Justice in almost identical language:

"The registrant told the Hearing Officer that his family were formerly members of the Lutheran Church and that he has two brothers who are working as Jehovah's Witnesses Pioneers; that he became interested in the Jehovah's Witnesses in the summer of 1951 and thereafter put in a year of study with the Jehovah's Witnesses before he was baptized in June 1952."

On August 17, 1956 the defendant was furnished with a copy of the recommendation of the Department of Justice and once again with a copy of the résumé of the F.B.I. investigation. He was advised:

"You may file with the Appeal Board a written reply concerning the recommendation of the Department of Justice within thirty days from the date of the mailing of this receipt, which date is the same as the date shown above.

"Your reply concerning the Department of Justice's recommenda-

tion and all other data in your file will be considered by this Board when it acts upon your appeal.[6]

"A copy of 'Résumé of the Inquiry' is also enclosed herewith."

Once again the defendant availed himself of the opportunity to explain. He wrote:

"Concerning the recommendation of the Department of Justice with respect to my claim to be classified as a conscientious objector, I am filing this reply. It has been somwhat [sic] delayed due to the birth of a baby boy to my wife and I. My wife had considerable trouble for about a week before and during the delivery. The baby was born on September 2, became ill within the hour and September 4, died. *Possibly this would have affected my classification.* (Emphasis supplied.)

"According to the Résumé of the Inquiry prepared 12–2–55, paragraph 1, I was brought up in this faith. This is false. My parents became Jehovah's Witnesses about the year 1948 and despite their good example I was not convinced that Jehovah's Witnesses had the true religion until 1952 whereupon I made public declaration of my dedication to Jehovah by being baptized June 1, 1952. * * *"

Then, again challenging the recommendation, he states:

"In the same paragraph it is stated that 'The résumé also shows that opinion was divided as to the sincerity of registrant's conscientious objection.' However, in reading my copy of the résumé I find only one reference to a fellow worker who seems to think I hold Saturday's as something special, and no divided opinions. This was before I claimed to be a conscientious objector and before my dedication to Jehova. I hold no day as above any other day."

Evidently in September 1956 the defendant felt that the recommendation containing his own statements regarding his family's prior affiliation with the Lutheran Church on its face cured any reference in the recommendation to the defendant's having been "brought up" in the faith of Jehovah's Witnesses as he chose to attack only the résumé on this ground. Conversely he relied upon the résumé to refute the statement in the recommendation that opinion was divided as to the sincerity of his conscientious objection. Even now defense counsel argues that "the statement in the recommendation that the defendant was brought up as one of Jehovah's Witnesses is a misrepresentation of fact that is *patent in the draft board file*"[7] (emphasis supplied), and that the statement in the recommendation that opinion was divided "is impeached as untrue by the résumé itself."[8]

How more forcefully could the defendant present his case than to develop by his testimony before the hearing officer and by his reply to the appeal board patent obvious discrepancies and contradictions between the recommendation and the résumé? The recommendation of the Department of Justice is, by regulation, advisory only[9] and is but

6. The chairman of the appeal board was a Baltimore attorney, of mature age and experience.

7. Defendant's brief, p. 19.

8. Defendant's brief, p. 23.

9. "(c) Upon receipt of the recommendation of the Department of Justice, the appeal board shall mail a copy thereof to the registrant together with a letter advising the registrant that, within 30 days after the date of such mailing, he may file with the appeal board a written reply concerning the recommendation of the Department of Justice. Upon receipt of the reply of the registrant or the expiration of the period afforded him to make such reply, whichever occurs first, the appeal board shall determine the classification of the registrant, and in its determination it *shall give consideration to, but shall not be bound to follow*, the recommendation of the Department of Justice. The appeal board *also shall give consideration to any reply to such recommendation re-*

one of four sources of information [10] which the appeal board is authorized to consider in classifying the registrant. That the appeal board in the instant case followed the prescribed regulations is evidenced by the appeal board's letter to the defendant advising him that his reply together with all other facts in the record would constitute the grounds for determining his classification.

In Gonzales v. United States, 1955, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467, the recommendation of the Department of Justice emphasized that the defendant was of a Catholic family and that he became a Jehovah's Witness one month after his registration while the defendant contended that he had renounced the Catholic belief several years prior to his registration and had embraced the faith of Jehovah's Witnesses prior to such registration. The Supreme Court held that the registrant must be given the opportunity to contradict the basis of the Department of Justice's conclusion or to diminish the forcefulness of its thrust. This the defendant in the instant case has been given.

On the whole record, the court is of the opinion (1) that there has been no denial of basic procedural fairness; (2) that there is evidence to support the determination of the appeal board; (3) that such determination is supported by substantial evidence; (4) that such determination is supported by a fair preponderance of the evidence; and (5) that beyond a reasonable doubt the defendant is guilty of violation of Title 50, U.S.C.A.Appendix, § 462.

---

*ceived from the registrant.* The appeal board shall place in the Cover Sheet (SSS Form No. 101) of the registrant the recommendation of the Department of Justice, a copy of its letter transmitting a copy of such recommendation to the registrant, and any reply to such recommendation received from the registrant." (Emphasis supplied) 32 CFR Sec. 1626.25(c), as amended.

10. "(b) In reviewing the appeal and classifying the registrant, the appeal board shall not receive or consider any information other than the following:

"(1) Information contained in the record received from the local board.

"(2) General information concerning economic, industrial, and social conditions.

"(3) Any advisory recommendation from the Department of Justice under section 1626.25.

"(4) *Any reply to* the recommendation of the Department of Justice *received from the registrant* under section 1626.25." (Emphasis supplied). 32 CFR Sec. 1626.24(b), as amended.